**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **Criminal Action No. 94-00002-KD** |
| | ) | |
| **RAYFORD STEVENS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>ORDER</u>**

This action is before the Court on Defendant Rayford Stevens' motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), supplements and exhibits, the United States' response and exhibits, Stevens' reply, and his supplement to the reply with exhibits (docs. 191, 192, 199, 202, 204, 205, 207).  Upon consideration, and for the reasons set forth herein, the motion is GRANTED, and Stevens' sentence is reduced to time served, effective **May 10, 2023,** to allow sufficient time to arrange his release and travel.  In all other aspects, the judgment remains in effect (doc. 111, 191-1). The Clerk is directed to provide a copy of this Order to the United States Probation Office to facilitate Stevens' five-year term of supervised release.

I. <u>Background</u>

On December 23, 1993, Stevens drove a truck with passenger/codefendant Darwin Knight to the JR Food Store. Stevens was 38 years old at the time of the offense.  He was not armed and did not exit the truck. Knight was armed. He exited the truck.  When victim Harold Dunn Jr. was leaving the store, Knight confronted him. When Dunn turned to enter his car, Knight shot him several times and Dunn fell to the ground.  Dunn's fiancé was a passenger in his car.  She saw Knight shoot Dunn. She exited the car and tried to help Dunn.  Knight then entered

Dunn's car and drove away.  Stevens drove away following Knight.  Dunn later died at the hospital.

The next day, December 24, 1993, Stevens voluntarily went to the police station and gave a statement. On January 20, 1994, he was indicted for the instant federal offense. Knight evaded officers the night of the shooting. He abandoned Dunn's car and fled on foot.  Knight was later arrested and subsequently identified as the shooter.

 In April 1994,[1] the jury found Stevens guilty of conspiracy to commit armed robbery of a vehicle (Count One), armed robbery of a vehicle (Count Two), and use of a firearm during a crime of violence (Count Three).  As to Count One and Two, respectively, he was sentenced to 60 months and life without parole, to serve concurrently. As to Count Three, he was sentenced to 60 months to serve consecutive to Count Three. If released, Stevens is subject to a five-year term of supervision. His convictions were affirmed on appeal.

Stevens' first motion to vacate pursuant to 28 U.S.C. § 2255 was denied. The denial was affirmed on appeal.  His second § 2255 motion was sent to the Court of Appeals for the Eleventh Circuit as a second or successive motion filed without prior authorization.  The Eleventh Circuit granted, in part, his application to file a second motion.  His second motion was denied. The

---

[1] In May 1994, the Mobile County Grand Jury indicted Stevens for the murder of Harold Dunn Jr. In June 1997, the action was *nol prossed* and he was released to the U.S. Marshal. Alacourt.com (last visited December 30, 2022).
https://v2.alacourt.com/frmCaseDetail.aspx?Code=MCnojEovK3HkPYFTAPmyAAnLbYV5vA12GtZCva0CnXN8Gt77rwyRPkEPCXn0%2fa4N&CDParam=JQbasY7qvB3G4TOTfawOaS19SWtPazlXmPDlXGBG3%2fA%3d

Eleventh Circuit denied his application for a certificate of appealability and motion to proceed on appeal in forma pauperis.[2]

Stevens is incarcerated at Federal Correctional Institution Jesup in Jesup, Georgia.  He is now 67 years old and has served approximately 29 years in prison.  He is currently assigned to work in UNICOR which trains inmates to make goods for sale to various entities including the United States.[3]  Stevens argues that "his skills in textiles that he has gained from UNICOR, and his prior work as an electrician and in maintenance and painting, will enable [him] to secure employment upon release." (doc. 191, p. 21).  His release plan includes residing with his mother and "help care for her, as she currently lives on her own" with the support of his sisters who live nearby (Id., p. 20).[4]

II. Statement of the law

Title 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, provides that upon motion of the defendant or the Director of the Bureau of Prisons, the Court may reduce a

---

[2] Stevens has also filed petitions pursuant to 28 U.S.C. § 2241, the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, and Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L.Ed.2d 619 (1971), in the Southern District of Georgia.

[3] According to the website, Jesup, Georgia has a UNICOR textile factory, and "UNICOR manufactures a wide variety of clothing, gloves, draperies, bedding, and other woven products. Our sophisticated high-speed looming machines weave cotton blankets, towels, and washcloths. We also have the capability to dye textiles."
https://www.unicor.gov/CapabilitiesClothingTextiles.aspx

[4] The United States points out that Stevens "appears to be physically capable of caring for another individual and working, which contradicts his claim that his physical health is seriously deteriorating" (doc. 202, p. 10).  In his reply, Stevens argues that "[i]t is unfair for the Government to suggest that [his] proposed plan to be a productive and law-abiding citizen upon release signifies that he is in fine health.  Mr. Stevens's intention to live with his elderly mother to provide companionship and help around the house does not dictate the conclusion that his health is not in decline. In addition, there are less-physically demanding jobs for seniors that he would be able to do in order to help financially support himself" (doc. 205, p. 3, n.1).

sentence if there are extraordinary and compelling reasons which warrant a reduction, certain procedural requirements are met[5], the relevant factors in 18 U.S.C. § 3553(a) weigh in favor of a reduction in sentence, and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).  The Court of Appeals for the Eleventh Circuit has held that "§ 1B1.13 is an applicable policy statement that governs all motions under Section 3582(a)(1)(A)." United States v. Bryant, 996 F. 3d 1243, 1262 (11th Cir. 2021).

The Policy Statement provides that upon motion under 18 U.S.C. § 3582(c)(1)(A)(i), the Court may reduce a term of imprisonment if it determines that the relevant factors in 18 U.S.C. § 3553(a)[6] weigh in favor of a reduction, there are extraordinary and compelling reasons which warrant a reduction, the defendant is not a danger to the safety of any other person or the community as provided in 18 U.S.C. § 3142(g), and the "reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.  However, the district courts need not analyze the above

---

[5] Defendants may file a § 3582(c)(1)(A) motion after they have "exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A).  The United States does not dispute that Stevens meets this requirement (doc. 202, p. 8) (doc. 202-1, copy of the Warden's denial letter).

[6] United States v. Lawson, No. 22-10851, 2023 WL 316143, at *2 (11th Cir. Jan. 19, 2023) ("In particular, the district court must consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to afford adequate deterrence, protect the public from the defendant's further crimes, and provide the defendant with needed education or treatment; the kinds of sentence and applicable guideline range under the Sentencing Guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities between similarly situated defendants; and the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a)(1), (2)(B) (D), (4)-(7), 3582(c)(2). The sentence must also reflect the seriousness of the offense, promote justice for the law, and provide just punishment for the offense. See § 3553(a)(2)(A).").

requirements in any specific order. <u>See United States v. Tinker,</u> 14 F. 4th 1234, 1237-1238 (11th Cir. 2021) (per curiam).  Importantly, should the movant fail to make a showing on any one requirement, that failure "would foreclose a sentence reduction." <u>Id</u>. at 1238.

The Policy Statement lists four examples of extraordinary and compelling reasons.[7] Stevens' motion is based on the example of "Age of the Defendant".  In this example, a reduction of sentence may be granted when the "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, at cmt. n.1(B).

III. <u>Analysis</u>

A. <u>Extraordinary and compelling reasons for a reduction of sentence</u>

Stevens argues that he "qualifies for compassionate release under the category, Age of the Defendant" because he is 67 years old, has served approximately 29 years in prison, and his physical health has seriously deteriorated because of the aging process (doc. 191, p. 10). Stevens argues that "it is critical to note that all of [his] major medical conditions have been diagnosed

---

[7] Stevens does not move pursuant to U.S.S.G. § 1B1.13, cmt. n.1(A). Note 1(A) indicates that extraordinary and compelling reasons exist when the "medical condition of the defendant" meets certain criteria.  Specifically, a terminal illness, or serious physical or medical condition, or serious functional or cognitive impairment, or age-related physical or mental health deterioration "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  He does not move pursuant to U.S.S.G. § 1B1.13, cmt. n.1(C), which identifies certain "family circumstances" which may provide grounds for a reduction of sentence. He does not move pursuant to U.S.S.G. § 1B1.13, cmt. n.1(D), which states that extraordinary and compelling reasons may exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id. at cmt. n.1(D).

while he was incarcerated, thereby demonstrating a substantial deterioration of his health as he aged through his 50s and 60s." (Id., p. 11).

"[D]eterioration due to age is extraordinary and compelling even if it does not diminish the ability for self-care as long as the defendant is at least 65 years old and has served the lesser of 10 years or 75 percent of his sentence." United States v. Bryant, 996 F.3d 1243, 1250 (11th Cir.), cert. denied, 211 L. Ed. 2d 363, 142 S. Ct. 583 (2021) (citing U.S.S.G. § 1B1.13 cmt. n.1(B)). [8]   However, Stevens must show a "'serious deterioration' beyond what is normal to many individuals as part of the aging process." United States v. Ramirez, 2022 WL 17411279, at *1 (11th Cir. 2022) (per curiam) (unreported opinion) (finding that district court did not err in deciding that Ramirez did not have a serious deterioration of health beyond what is normal for many individuals during the aging process).   And he must be presently experiencing the serious deterioration of his health. United States v. Monaco, 832 Fed. Appx. 626, 629–30 (11th Cir. 2020) ("… Monaco argues that the body and mind deteriorate over time – and indeed they do – but until he has actually experienced a 'serious deterioration' because of the aging process, the policy statements do not support age alone as an extraordinary and compelling reason for compassionate release.").

Stevens meets the age and years of imprisonment requirements.   He is 67 years old and has served approximately 29 years in prison.   Thus, the Court will address whether he has shown

---

[8] The United States argues that Application Note 1(A)(ii) requires a showing that Stevens' "serious physical or medical condition substantially diminishes" his "ability to provide self-care while incarcerated …" (doc. 202, p. 13).   The United States argues that Stevens "appears capable of providing self-care in prison and has not argues otherwise" (Id.).   In reply, Stevens points out that he has not moved pursuant to Application Note 1(A), but instead as to Application Note 1(B), which does not require this showing (doc. 205).

that his health has seriously deteriorated because of the aging process,[9] that his serious

deterioration is beyond normal for many individuals as part of the aging process, and that he is

presently experiencing a serious deterioration.

   As an initial consideration, Stevens consistently argues that he is not receiving prompt or

proper medical treatment in prison and therefore, his health has deteriorated and will continue to

deteriorate as he ages (doc. 191, doc. 199, doc. 205, doc. 207).  His medical experts consistently

opine that Stevens is not receiving prompt or proper treatment for his diagnosed illnesses and if

he does not receive treatment his conditions will worsen in the future[10] (doc. 191-4

(Rheumatologist); doc. 191-5 (Gastroenterologist); doc. 191-6 (Ophthalmologist), doc. 191-7

---

[9]  Stevens also argues that the "amount of serious medical care" he has received "is evidenced by
his numerous transfers to the local hospital" (doc. 191, p. 12, citing doc. 191-2, p. 9-13, inmate
history).  The records span from 1994 to 2021 and appear to be "in and out" logs with starting
and stopping dates and times.  Although the log frequently reads "trip to local hosp w/retn",
many entries are for a single day which is possibly medical visits or outpatient procedures. For
example, on July 1, 2021, the log entry reads "Local hosp ESC trip to local hosp w/retn" (doc.
191-2, p. 9).  But Stevens did not go to a hospital on July 1, 2021. Instead, he went to Schultz
Eye Clinic for an ophthalmologist consult in Savannah, Georgia (doc. 191-3, p. 52-55).  There is
a similar entry corresponding with Stevens' August 2019 colonoscopy. Some multiple-day
entries do appear to be for hospital admissions, such as August 22, 2012, to August 24, 2012
(doc. 191-2, p. 12), but not all "trip to local hosp w/retn" log entries mean that Stevens was
hospitalized.

[10] "Mr. Stevens's health, teeth, and vision will continue to deteriorate as he ages if he does not
receive proper treatment and regular care." (doc. 191, p. 7) (citing doc. 191-4; doc. 191-5; doc.
191-6; doc. 191-7). "'Reducing Mr. Stevens's risk of blindness, the prevention of cancer, and
preventing terminal or debilitating medical conditions will require medical treatment and care
likely for the rest of his life.'" (Id.) (citing doc. 191-4; doc. 191-6). "If Mr. Stevens does not
receive proper dental care, these problems with his teeth and his ability to eat will continue to
have a negative impact on Mr. Stevens's overall health as he ages."  (doc. 191, p.16) (citing doc.
191-7). In his updated expert declaration, Dr. Samarasena states that "Mr. Stevens continues to
have several serious medical conditions which require prompt medical evaluation. If Mr. Stevens
does not receive the necessary treatment, this could lead to irrevocable harm to his quality of life
and a decrease in his life span" (doc. 199-4). Dr. Desai, the reviewing rheumatologist indicated
that Stevens needed to be seen by a rheumatologist, ophthalmologist, endocrinologist,
gastroenterologist, and urologist (doc. 191-4).

(Dentist).  The primary issue is not whether Stevens is receiving prompt and proper medical treatment, but instead whether he is presently experiencing a serious deterioration of his health because of the aging process.  Not receiving prompt or proper medical treatment at any age will worsen any condition.  Additionally, this argument – that inadequate medical care may be an extraordinary and compelling reason for a reduction in sentence – appears to be foreclosed by circuit precedent. United States v. Bryant, 996 F. 3d 1243, 1263-1265 (11th Cir. 2021) (holding that the language "[a]s determined by the Director of Bureau of Prisons" contained within the catch-all provision precludes district courts from finding extraordinary and compelling reasons beyond those specified by the Sentencing Commission in Section 1B1.13); United States v. Giron, 15 F.4th 1343, 1347 (11th Cir. 2021) ("We held in Bryant that this language precluded district courts from finding extraordinary and compelling reasons within the catch-all provision beyond those specified by the Sentencing Commission in Section 1B1.13.").

As another initial consideration, Stevens provides a list of diagnosed illnesses and argues that "all" of these medical conditions "are current conditions according to his BOP Medical Records."[11] (doc. 191, p. 11) (underlining in original).  A close review of the prison medical

---

[11] "Medical Condition" and "Year of Diagnosis" - Hyperlipidemia 2008, Hypertension 2008, Lumbar disc disorder 2009, Dental Caries (tooth decay) 2009, Lipoma (growing tumor under left arm) 2010, Idiopathic Peripheral Neuropathy (nerve damage) 2010, Benign Hypertrophy of Prostate 2011, Arthropathy (joint disease) 2011 Carpal tunnel syndrome 2012, Blindness in one eye, low vision other eye 2012, Corneal opacity (eye) 2012, Rheumatoid Arthritis 2013, Sickle Cell Trait 2013, Hepatitis C 2013, Sicca Syndrome (Sjogren's-immune system) 2014, Iridocilitis (inflammation of the iris and uvea) 2014, Disorder of orbit (eye) 2014, Pulpitis (tooth decay) 2014, Anomalies of Nails 2014, Hypercalcemia 2014, Glaucoma 2015, Meniscus Derangements (knee) 2016, Restless Leg Syndrome 2016, Disorder of Prostate 2017, Posterior Vitreal Detachment (eye) 2017, Retinal Detachment (eye) 2017, Disorder of Vitreous Body (eye) 2017, Polyneuropathy (nerves) 2018, Colon Polyps 2018, Artificial Eye 2019, Chronic constipation 2019, Lichen Planus (skin) 2019, Infected Bursitis (knee) 2019, hyperparathyroidism 2021, and Vitamin D deficiency 2022 (doc. 191, p. 11-12).

records does not support Stevens' position as to several of his medical conditions.  For example, he argues that he currently has "iridocyclitis (inflammation of the iris and uvea)" and if left untreated he may go blind in his remaining eye (doc. 191, p. 5-6, 11, 15).  He argues that the presence of iridocyclitis indicates that his rheumatoid arthritis is not well-managed (Id.).  His reviewing expert rheumatologist reports that iridocyclitis is "a manifestation of RA in the eye" and its presence indicates that the rheumatoid arthritis is not controlled (doc. 191-4, p. 2; (doc. 199, p. 3).

Taking a line from the "Current" section of his records:

| Description | Axis Code-Type | Code | Diag. | Date Status | Status Date |
|---|---|---|---|---|---|
| Unspecified iridocyclitis | | | | | |
| 12/04/2014 07:59 EST Libero, Peter MD | III | ICD-9 | 364.3 | 12/04/2014 Current | 12/04/2014 |

(Doc. 191-3, p. 2).

Although this entry is in the section labeled "Current", the "Status Date" associated with iridocyclitis is "12/04/2014."[12]  Stevens' July 2021 clinic notes indicate "History of iridocyclitis/Uveitis in the past" (doc. 191-3, p. 51) and his December 2020 clinic notes indicate "History of Right eye problems (Uveitis, …) (Id., p. 64).  In July 2021, he saw an ophthalmologist in Savannah, Georgia. There is no mention of iridocyclitis or uveitis in the report (doc. 191-3, p. 52-55).  In July 2022, the prison clinician noted that Stevens was to return to the ophthalmologist (doc 207-1, p. 17). There are no records of an ophthalmology visit in the 2022 medical records provided to the Court. (doc. 199-3; doc. 207-1). However, during 2022, the

---

[12] The medical records indicate that "unspecified iridocyclitis" and "uveitis" were diagnosed in December 2014 (doc. 191, p. 2).

prison medical records indicate complaints of dry eye, redness, irritation, and worsening floaters (on one occasion), but no infection, eye pain or vision change (doc. 199-3, p. 1-2; doc. 207-1).[13]

As another example, Stevens includes "Colon Polyps 2018" in his list of "Current" medical conditions (doc. 191, p. 12). His medical records indicate a history of colon cancer. A colonoscopy was performed in April 2018 and an adenocarcinoma was removed in June 2018 (doc. 191-3, p. 38, 51) ("stage 1 colon cancer", p. 91). His August 2019 colonoscopy showed "no neoplasia at region of anastomosis". A polyp was removed, and a follow up colonoscopy was recommended (Id., p. 91; p. 110 "colonoscopy in 3 years", p. 113, "negative for dysplasia and malignancy"). In February 2022, Stevens had another colonoscopy "with orders to repeat colonoscopy in 5 years" (doc. 207-1, p. 17). Thus, he does not appear to presently have colon cancer or colon polyps.

At present, the evidence shows that Stevens is categorized by the Bureau of Prisons as a "Level Care 2" inmate and currently "stable, chronic care" (doc. 191-2, p. 2). He is medically cleared for "regular duty w/med restriction" and "cleared for food service" (Id., p. 3). He sleeps on a lower bunk on a pressure reduction mattress, has a back brace and a knee brace, is allowed "to wear dark glasses or tinted lens", and has a prosthetic left eye (doc. 204, p. 1). Stevens has

---

[13] In May of 2022, the registered nurse examined Stevens' eye and noted "Inmate complaining of increased dryness of the right eye, and irritation. Inmate wears corrective lenses (glasses) as well as having a prosthetic in the left eye. Sclera noted to be red with irritation noted. No complaints of vision change at this time. Cataract noted in the right eye. Inmate instructed to purchase artificial tears from commissary, and given lid cleansing wipes to help with irritation, and moisturize. Inmate verbalizes understanding and agrees to plan of care." (doc. 199-3, p. 2). The last records indicate that in July 2022, an "offsite appt" with an ophthalmologist was requested (doc. 207-1, p. 17). The nurse noted "inmate c/o worsening floaters and b/l eye dryness with known glaucoma and prosthetic" left eye (Id.). The nurse also noted that Stevens was to return to the ophthalmologist in November 2021, but the Court has no records of that visit. (Id.).

medical conditions which limit vision in the remaining eye (doc. 191, p. 6, 11, 14-16). He is restricted from working near dust, chemicals, or irritants (doc. 204, p. 1).

As of January 24, 2022, Stevens' current medications were acetaminophen 325 mg, two tablets at bedtime, as needed; adalimumab injection 40 mg "every other week"; and hydroxychloroquine 200 mg, twice a day, for his rheumatoid arthritis and pain (doc 191-3, p. 18, 32) and duloxetine 60 mg once per day for "restless legs syndrome (RLS), Carpal tunnel syndrome, Other specified idiopathic peripheral neuropathy, Sicca syndrome, Rheumatoid arthritis, Arthropathy, unspecified, Polyneuropathy, unspecified" (Id.).

He also takes doxazosin 2 mg, twice per day,[14] and tamsulosin 0.8 mg, once per day, for benign prostate hyperplasia (Id.); furosemide 20 mg once per day and losartan potassium 50 mg once per day for high blood pressure (Id.); and latanoprost ophthalmic solution, one drop in the right eye at bedtime, daily, for glaucoma (Id.). Stevens uses artificial tears during the day as needed, and a lubricating eye ointment at night in his right eye for sicca syndrome/ Sjogren's syndrome (dry eye) (doc. 191-3, p. 51, 64). He takes cholecalciferol, one capsule per week for low Vitamin D (doc. 207-1, p. 12) and medications for constipation (doc. 207-1, p. 3-4).

As previously stated, Stevens argues that "all of [his] major medical conditions have been diagnosed while he was incarcerated, thereby demonstrating a substantial deterioration of his health as he aged through his 50s and 60s" (doc. 191, p. 11). Addressing the list of his alleged "current"[15] conditions" (Id.):

---

[14] In August 2022, the dose was increased to 8 mg (doc. 207-1, p. 6).

[15] Stevens also lists "anomalies of nails" diagnosed in 2014, "Lichen Planus (skin)" diagnosed in 2019, and "chronic constipation" diagnosed in 2019 (doc. 191, p. 12). The information regarding "anomalies of nails" reads "non-fungal? Sequelae of hepatitis C" (doc. 204-1, p. 5). Stevens reported: "My toes have been bleeding and aching. He admits that he has been trying to

1) Hyperlipidemia

Stevens argues that he has hyperlipidemia, a condition that "often correspond[s] with aging" (doc. 191, p. 3, 6).  Hyperlipidemia is among his "myriad of health problems" which show his health is deteriorating because of aging (Id., p. 3).  He was diagnosed in 2008 (Id., p. 11).  However, he does not take any medication for hyperlipidemia. On August 16, 2022, his total cholesterol was 189, which is less than the ceiling of 200 (doc. 207-1 p. 8, lab report). In July 2021, the clinician wrote "Hyperlipidemia in remission. His LDL = 108 in Jan 2021. He is at goal. No cholesterol meds at this time." (doc. 191-3, p. 51).  In 2020, he was "at goal" with no cholesterol medication (doc. 191-3, p. 64).

2) Hypertension

Stevens includes hypertension among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). He reports that he was diagnosed with hypertension in 2008 (Id., p. 11).  In July 2022, he was seen in the "Chronic Care Clinic" (doc. 207-1, p.15).  The nurse practitioner noted a history of hypertension and assessed "Benign Essential … Current – cont[inue] current therapy" (Id., p. 16) (bracketed text added).  In December 2021, a medical doctor noted Stevens' hypertension as "benign, essential" and "appears stable, continue serial" (Id., p. 2, 31-32; doc. 204, p. 4).  In July 2021, the clinician noted that Stevens was advised to add a medication and continue taking two other medications (doc. 191-3, p. 51).  The records do not indicate any complications or hospitalizations for hypertension.  His hypertension appears managed with medications.

---

clean it. The fungal stain was negative, and the patient has been advised that hepatitis would cause nail deformity however he has refused the Mayvret treatment." (doc. 191-3, p. 85). Stevens has now completed treatment for Hepatitis C with a different medication.

The Court could not find treatment records for "Lichen Planus."  However, in December 2019, the prison doctor reported "multiple maculopapular brown-black papules in bil. LE" and requested a dermatology consult (doc. 191-3, p. 90-91). This appears to be a skin condition in Stevens' lower legs.  But future medical records do not mention it. Although the medical records indicate that Stevens is frequently prescribed a laxative for constipation and advised to increase fluids, there is no evidence indicating that this condition presents as a serious deterioration because of the aging process beyond what is experienced by other individuals as part of the aging process.

3) <u>Lumbar disc disorder</u>

Stevens reports his diagnosis with lumbar disc disorder in 2009 (doc. 191, p. 11). In 2012, he was assessed with a "past medical history" of "chronic back pain from a pinched nerve" (doc. 191-3, p. 119-120).  He was issued a back brace in 2012 and again in 2019 (doc. 207-1, p. 22-23). He is assigned to a lower bunk and has a pressure sensitive mattress.  In 2009, 2016, and 2017, he was diagnosed with "backache" or back pain (doc. 191-3, p. 9, p. 116; doc. 204, p. 11).   In December 2019, the examiner wrote "lumbar DDD [degenerative disc disease] [lower back pain] + left lumbar radiculopathy symptoms stable" (doc. 191-3, p. 90).  In 2020, he reported "pain with back motion" (Id., p. 74, 78).  In July 2021, the examiner noted "possible lumbar radiculopathy. Continue duloxetine 60 mg at bedtime and Tylenol as needed for pain" (doc. 191-3, p 51). Stevens argues that his "arthropathy (joint disease)" causes "frequent pain" (doc. 191, p. 14). However, his most recent medical records do not contain any complaints of low back pain or radiculopathy (doc. 207-1).  Thus, his lower back pain appears to be resolved or managed with medications[16] and a back brace.

4) <u>Sickle Cell Trait</u>

Stevens reports that he was diagnosed with Sickle Cell trait in 2013 (doc. 191, p. 11).  However, he does not appear to have any symptoms of Sickle Cell disease (doc. 191-3, p. 51, "Sickle-cell trait --- asymptomatic His H/H was normal … in Jan 2021"). There are no medical records indicating treatment for Sickle Cell disease.

5) <u>Hepatitis C</u>

Stevens includes Hepatitis C among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). He was diagnosed with Hepatitis C in 2013. He argues he "will need constant treatment and monitoring for Hepatitis C" and that Hepatitis C puts him at greater risk of serious illness if he contracts Covid 19 (Id., p. 3, 11, 15).

---

[16] As of January 24, 2022, Stevens' current pain medications were acetaminophen 325 mg, two tablets at bedtime, as needed (doc 191-3, p. 18, 32) and duloxetine 60 mg once per day for "restless legs syndrome (RLS), Carpal tunnel syndrome, Other specified idiopathic peripheral neuropathy, Sicca syndrome, Rheumatoid arthritis, Arthropathy, unspecified, Polyneuropathy, unspecified" (Id.).

His updated medical records indicate that on April 25, 2022, he completed a twelve-week course of treatment with a daily tablet of Vosevi (doc. 207-1).  In January 2022, Stevens met with the pharmacist to discuss the treatment.  The pharmacist noted that prior treatment with Mavyret was stopped because of side effects (doc. 191-3, p. 17).  The pharmacist also wrote "No liver biopsy. Multiple abdominal CT scans liver unremarkable 09/26/18, 08/03/18, 07/11/18, 05/11/18. Does not appear to have cirrhosis.  No HIV coinfection. No HBV coinfection - immune" (Id.).  In July 2022, the nurse practitioner wrote "ID- Hep C; [inmate] completed tx of Vosevi 4/25/22 and the [viral load] was <15 in 6/22" (doc. 207-1, p. 15).  The viral load had been 2,870,000 in October 2021 (doc. 191-3, p. 17).  Thus, Stevens' Hepatitis C appears to be in remission or cured with medication, without any liver damage.

6) Dental Caries and Pulpitis

Stevens includes dental issues among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). Stevens argues that his ongoing dental problems, beginning in 2009,[17] "correspond with aging" and are evidence of serious deterioration of health because of the aging process (doc. 191, p. 6-7, 15-16).  He argues that "as he has aged in prison," he "has lost the majority of his teeth and his remaining teeth are cracked and damaged" (Id., p. 16).  He argues that he "is unable to intake sufficient nutrients from the food that he eats, thereby hurting his overall health" and that if he "does not receive proper dental care, these problems with his teeth and his ability to eat will continue to have a negative impact on [him] as he ages." (Id., p. 16) (citing doc. 191-7). He points out that he lost his partial dentures in 2018 and did not receive new dentures until January 2022 (Id., p. 6-7).

The records indicate that Stevens had dental procedures in 2017, 2019, and x-rays and restorations in 2020 (doc. 191-3, p. 87-88).  He was examined in May 2021, and found with six decayed teeth, sixteen missing teeth, and four filled teeth (Id., p. 58).  At that time, he had some restorations to the decayed teeth, x-rays, and dental charting (Id.,

---

[17] The records indicated fractured teeth and cavities with intermittent dental pain (doc. 191-3, p. 8 (2011, 2018), p. 4 (2015), p. 2 (2014).

p. 59-60).  In August 2021, the dentist performed procedures to restore the remaining teeth and prepare for dentures (doc. 191-3, p. 47-48).  Stevens obtained new dentures in January 2022.

Stevens points to the lack of proper dental care as a contributing factor to the serious deterioration of his health.  Primarily, he argues that because of his chewing method, which compensated for lost and damaged teeth, he was not able to take in sufficient nutrients from food.[18]  However, no medical care provider found that Stevens was malnourished.  The records indicate that in November 2019, Stevens, who is 6'1" tall,[19] weighed 206 pounds. At that time, his Body Mass Index was 27.2 or overweight (BMI between 25 to 29.9).

https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm In September 2020, he weighed 221 pounds; in February 2021, he weighed 211 pounds; in April 2021, he weighed 215 pounds; in July 2021, he weighed 222 pounds; and in December 2021, shortly before he received his dentures in January 2022, Stevens weighed 220 pounds (doc. 191-3, p. 38).  On January 24, 2022, he weighed 226 pounds.  On February 2, 2022, he weighed 220 pounds. At that time, his Body Mass Index was 29.03 or overweight (BMI between 25 to 29.9) (doc. 199-3, p. 29).[20]

https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

7) Lipoma

Stevens was diagnosed with a lipoma under his left arm in 2010, which was removed April 29, 2022, after it increased in size (doc. 199, p. 2; doc. 199-3, p. 14).  In

---

[18] Dr. Doyle, the reviewing dental expert, stated he is "familiar with periodontal disease" and has "an understanding of the natural progression of this disease…" (doc. 191-7).  He opined that Stevens' method of compensating for lack of dentures from 2018 to 2022, "is not as effective and results in lower nutritional intake from his food and causes bowel problems." He also opined that if Stevens "does not receive proper dental care, these problems with his teeth and his ability to eat will continue to have negative impacts on [his] overall health as he ages." (doc. 191-7).

[19] The general surgeon noted Stevens' height at "73 in" (doc. 199-3, p. 30).

[20] The surgeon noted: "General Appearance – Not anxious, not depressed, not in acute distress, not sickly. Orientation – Oriented x 3. Build & Nutrition – Well nourished. Hydration – Well-hydrated" (doc. 199-3, p. 30).

his supplement, Stevens asserts that the lipoma might be a malignant liposarcoma instead of lipoma but there is no evidence a biopsy was performed. He argues that further testing is necessary to rule out cancer (doc. 199, p. 2).  He points out that in July 2022, the prison doctor recommended an "urgent" follow-up MRI and consult with a general surgeon (doc. 207, p. 3, citing doc. 207-1, p. 16-17), but neither has occurred.

A closer review of the medical records indicates that this "urgent" recommendation may have been made <u>before</u> Stevens had the lipoma removed in April 2022, even though it appears in the July 2022 medical records. Those records state:

> *CT Thorax with IV contrast 12/27/21* revealed 8.2 X 4.9 cm fatty lesion within left axilla, increased in size compared to prior exam. There are no suspicious features other than the change in size. This is most likely a lipoma however a *contrasted MRI is recommended for f/u in 3-6 months*.  REQUESTING THE CONTRASTED MRI OF THORAX-ATTN LEFT AXILLA AREA
>
> IM is to have contrasted MRI of thorax for enlarging left axilla mass and then return to General surgery with results of CT Chest (in BEMR) and also the MRI Thorax.
> REQUESTING IM TO RETURN TO GS AS REQUESTED ON LAST CONSULT WITH ABOVE RESULTS FOR CONSULTATION FOR *POSSIBLE SURGERY*

(Doc. 207-1, p. 17) (emphasis in original) (italics added).

In other words, a contrasted MRI was recommended for "3-6 months" after "12/27/21". (Id.).  Three to six months after December 2021 would include April 2022 when the lipoma was removed. There is no apparent reason to recommend, in <u>July 2022</u>, an MRI for an "enlarging left axilla mass" or a "consultation for possible surgery" when the mass was already removed in <u>April 2022</u> (doc. 199-1, p. 10-26, Id., p. 14 "excision of left axillary mass").  Although there is no record of a "contrasted MRI" performed "3-6 months" after the CT in December 27, 2021, the record indicates that the lipoma was removed within that time frame. The medical records also indicate that Stevens' received follow-up wound care in prison without serious complications (doc. 199-3, p. 3-7).

8) <u>Carpal tunnel syndrome 2012, idiopathic peripheral neuropathy (nerve damage)</u>

<u>2010, restless legs syndrome 2016, polyneuropathy (nerves) 2018</u>[21]

Stevens argues that these conditions are related to his rheumatoid arthritis and cause "frequent pain" (doc. 191, p. 14).  However, the medical records contain few references to these conditions and indicate that his pain is controlled with duloxetine (doc 191-3, p. 18, 32; doc. 207-1, p. 11, 14) (duloxetine 60 mg once per day for "restless legs syndrome (RLS), Carpal tunnel syndrome, Other specified idiopathic peripheral neuropathy, Sicca syndrome, Rheumatoid arthritis, Arthropathy, unspecified, Polyneuropathy, unspecified" (doc. 207-1, p. 14).

9) <u>Benign prostate hyperplasia; disorder of prostate</u>

Stevens includes benign prostate hyperplasia among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). He argues that his prostate issues correspond with aging (doc. 191, p. 6).  He reports that he was diagnosed with BPH in 2011 and prostate disorder in 2017.  Stevens' reviewing medical expert states that benign prostate hyperplasia (BPH) is a "condition that affects men as they age" and that "prostate cancer is of concern given Mr. Stevens' age." (doc. 191-4). However, another reviewing medical expert states that from his "review of the medical records, Mr. Stevens has issues with constipation and urinary symptoms that may be a symptom of having had a [low anterior resection] rectal surgery" for cancer but, "alternatively" BPH "also causes many urinary symptoms and is often seen in males as they age." (doc. 191-5).

In September 2022, Stevens was seen for complaints with urination. Medications were prescribed (doc. 207-1, p. 6).  His Chronic Care Notes from July 2021 state "BPH with nocturia [waking up to urinate during the night] still with urinary symptoms change his Tamsulosin to 0.4 mg BID and add doxazosin 2 mg BID. We may need to consider a urology consult. His PSA was normal at 4.02 in Jan 2021. Stop the finasteride due to side-effects for this medication." (doc. 191-3, p. 51) (bracketed text added).  His Chronic Care Notes from December 2020 state "1cm prostate nodule – Prostate biopsy in

---

[21] These diagnoses are grouped because they implicate nerve-related issues and were rarely mentioned in the medical records.

[October 19, 2020][22] was negative for any prostate cancer. His PSA level was normal at 0.452 in April 2020. BPH with mild obstructive symptoms controlled on his Tamsulosin 0.8 mg at bedtime plus finasteride 5 mg daily." (Id., p. 64). Stevens' BPH appears to be managed with medications.

      10) Vision

Stevens includes eye problems among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). Stevens argues that his vision has seriously deteriorated because of the aging process as evidenced by his multiple eye-related medical conditions, some of which may be related to his rheumatoid arthritis (doc. 191, p. 4, 6, 14-16, doc. 199, p. 3, doc. 207, p. 2). The medical records indicate that in 2012, Stevens lost his left eye due to an infection, and in 2014, the lens was replaced in his right eye (doc. 191-3, p. 2, 52, 64). In 2017, Stevens had surgery for a retinal tear or detachment which appears to be resolved (doc. 191-3, p. 52, p. 64; doc. 191-6).[23] Stevens also has a history of iridocyclitis and uveitis (doc. 191-3, p. 51, 64). He currently has glaucoma, cataract, corneal opacity, and dry eye syndrome/sicca syndrome/Sjogrens syndrome, and the potential for retinopathy from long term use of hydroxychloroquine for rheumatoid arthritis.

Stevens argues that his rheumatoid arthritis has manifested as iridocyclitis and uveitis in his remaining eye and he could go blind, that sicca syndrome or Sjogrens syndrome (dry eye syndrome) is an eye-related immune system disorder that may accompany rheumatoid arthritis,[24] and that "he faces a risk of blindness due to the

---

[22] The doctor wrote "Oct 2019". However, the biopsy report was dated October 19, 2020 (doc. 191-3, p. 68-72).

[23] The medical records from December 2019, indicate that the "retinal hole" was repaired. Specifically, "OD retinal hole s/p surgery no hole visualized today or on recent Ophtho-retina evaluation…" (doc. 191-3, p. 90).

[24] According to the National Institute for Health, Sjogren Syndrome "is a systemic rheumatic disease with autoimmune-induced inflammation of the lacrimal and salivary glands, resulting in impaired tear and saliva production." Sicca Syndrome – dry mouth and eye – may present for reasons other than Sjogren Syndrome or rheumatoid arthritis (last visited February 24, 2023) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6245643/

possibility of retinal toxicity due to [his] rheumatoid arthritis medication [Plaquenil] (doc. 191, p. 15-16).  Stevens' expert ophthalmologist did not offer any opinion regarding dry eye syndrome, iridocyclitis or uveitis (doc. 191-6).  He did opine that the Plaquenil, which Stevens takes for rheumatoid arthritis may damage his retina, and his retina should be monitored.

In October 2020, Stevens complained that his "vision has been fussy" and his eye was "red and irritated for the past couple of days" but without pain (doc. 191-3, p. 67).  The examiner noted no "discharge/matting, itching, pain, trauma" (Id.).  On November 12, 2020, Stevens complained that his "right eye is still infected" and that the eye drops "didn't help" (Id., p. 66).  He reported burning on a pain scale of four (Id.).  In February 2021, Stevens asked to see an eye doctor with complaints of vision loss on the sides.  No redness, irritation, or pain was noted (Id., p. 63).  In July 2021, Stevens was seen by an ophthalmologist. At that time, visual acuity in his right eye was 20/30-2 with "full" motility and visual field (Id.).  The ophthalmologist diagnosed "mild stage chronic open angle glaucoma: Stable. Continue present meds" (eye drops of latanoprost) (Id., p. 55).  The ophthalmologist noted that there was "no evidence of Plaquenil retinopathy" from long term use of this medication to treat rheumatoid arthritis (Id., p. 52-55).  The ophthalmologist also diagnosed cataract,[25] corneal opacity ("moderate centrally"), and dry eye syndrome for which he recommended lubricating eye drops (doc. 191-3, p. 52-54).  Although the ophthalmologist did not specifically diagnose Sicca Syndrome or Sjogren's Syndrome, which present with dry eye, he did note a history of dry eye syndrome, and there were numerous references to same in Stevens' medical records (doc. 191-3, p. 32, 51, 64, 94-95).

In May 2022, the prison nurse recommended artificial tears and cleansing wipes for dryness, inflammation, and redness in Stevens' eye but no complaints of vision changes (doc. 191-3, p. 1-2). In July 2022, Stevens complained of "worsening floaters and b/l eye dryness" (doc. 207-1, p. 17).  His medication orders indicate that he was

---

[25] The ophthalmologist noted that Stevens' lens was replaced in 2014 (doc. 191-3, p. 52).  At the visit in July 2021, he assessed "posterior capsular opacification visually significant of right eye" (Id., p. 54), which appears to mean "secondary cataract."

taking hydroxychloroquine (Plaquenil) for sicca syndrome and rheumatoid arthritis (doc 191-3, p. 14).  In August 2022, Stevens complained that his eyes were dry, and he needed medication (doc. 207-1, p. 11).  The records indicate that an ophthalmology consult was recommended (Id., p. 17).

    11) Rheumatoid Arthritis and Arthropathy (joint disease)

Stevens includes rheumatoid arthritis among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). Stevens was diagnosed with rheumatoid arthritis in 2013 (doc. 191, p. 11).  He reports that he has "rheumatoid arthritis, an autoimmune disease, and related auto-immune conditions" (Id., p. 5, 14).  Stevens argues that several other medical conditions and symptoms are related to the rheumatoid arthritis.  Specifically, "arthropathy (joint disease), joint pain, restless leg syndrome, carpal tunnel syndrome, sicca syndrome (chronic immune system disease) and polyneuropathy (multi-nerve damage and malfunction)" (Id., p. 14) (addressed in paragraph 8, 10, and 13).

Stevens argues that his rheumatoid arthritis causes him to be in "frequent pain" (doc. 191, p. 14-15).  He also argues that his "significant leg and knee pain, swelling, and numbness" indicates that his rheumatoid arthritis is not managed effectively (doc. 191, p. 5; doc. 199, p. 3) (leg and knee pain are addressed in paragraph 13).  He argues that his recent lab report showed low white blood cells, which suggests that his rheumatoid arthritis is not well-managed in the prison. (Id., p. 15). He also points out that he has not seen a rheumatologist in several years.

Stevens' medical records indicate that he takes hydroxychloroquine (Plaquenil) 2 per day, Adalimumab (Humira) (injection every other week), and Duloxetine 1 per day, for his RA (doc. 207-1, p. 14) (July 29, 2022).  The Duloxetine is also prescribed for other medical conditions (see paragraph 8).  Stevens asserts that he frequently experiences pain related to rheumatoid arthritis.  However, his medical records indicate he frequently denied having pain. (doc. 191-3, p. 29, 35, 50, 56, 63, 67, (denials); doc. 191-3, p. 74, ("Musculoskeletal: Painful joints denies" but reported "pain with back motion"), Id., p, 78 (same); Id., p. 79, 85, 101, 106 (denials); doc. 199-3, p. 1, 3, 7; doc. 207-1, p. 1, 3-4, 5-6, 11, 15).

20

In December 2019, the prison doctor noted "no synovitis"[26] in Stevens' upper and lower extremities and that his "mcp joints"[27] were "unremarkable bilaterally" (doc. 191-3, p. 90, 92). In December 2020, the clinician noted: "Rheumatoid arthritis with multiple joint pains. Continue his Hydroxychloroquine 200 mg two tabs = 400 mg/day and his Humira (Adalimumab) injection 40 mg every 2 weeks. He is clinically stable and about the same." (Id., p. 64). The clinical notes from July 2021 indicate: "Rheumatoid arthritis – (multiple joints) currently on treatment with Plaquenil (Hydroxychloroquine) 400 mg daily, Humira (Adalimumab) injection 40 mg every other week (every 2 weeks) and Tylenol as needed for pain – Stable" (doc. 191-3, p. 51).

Stevens most recent treatment records from 2022 indicate the examiners have found as follows:

October 20, 2022 – "Inmate seen in health services for sick call. Inmate has complaints of a blister in his nose. Inmate has complaints of constipation. Inmate has questions about his increased dose of Doxazosin. Vitals assessed and stable. No signs or symptoms of distress noted at this time. Condition Stable." (doc. 207-1, p. 1).

October 13, 2022 – "Condition Stable. Inmate reports LBM 10/11/22 and describes as hard with "pebbles". Bowel sounds hypoactive x4 quadrants. Abdomen soft nontender x4 quadrants. MD on shift notified. TOVO rx given. Inmate instructed to return to medical sick call if no bowel movement occurs. …" (Id., p. 2).

September 30, 2022 – "Appearance … Appears Well, Alert and Oriented x 3" . . . Inmate to health services complaining of constipation and difficulty urinating x 2 days. Inmate denies pain. Inmate denies dysuria. Inmate reports urinary hesitancy. . . .. Inmate in no distress." (doc. 207-1, p. 3-4).

---

[26] "Inflammation of joint tissue called synovium is called synovitis. This condition may develop as the result of repetitive joint movement, an injury, infection, or arthritis. Synovitis may cause joint pain, tenderness, swelling, stiffness, and other symptoms." https://www.arthritis-health.com/glossary/synovitis

[27] "The metacarpophalangeal (MCP) joints" are joints between the palm of the hand and the fingers. https://www.ncbi.nlm.nih.gov/books/NBK538428/

September 12, 2022 – "I am having a problem with urinating. I have to strain to go, sometimes I feel like I need to go and can't. … Appears Well, Alert and Oriented x 3" (Id., p. 5).

August 2, 2022 – The doctor noted that Stevens "walked in, got up/down off exam table w/ease in no apparent distress."  Stevens reported no pain but was "irritable" and had a "myriad of complaints" (Id., p. 12).

Although the clinical notes mention "joint pain" the only "joints" that have been specifically assessed are his left knee and lower back (See paragraphs 13 and 3). There is no indication that the medical doctors attributed the degenerative disc disease in his back or the osteoarthritis, chondromalacia patella syndrome, etc. in his left knee to his rheumatoid arthritis (See paragraphs 3 and 13).  Moreover, none of the examining doctors indicated that these joint issues impair Stevens' range of movement.  In 2019, the prison doctor noted Stevens was positive for pain in the left knee but found no decrease of range of motion, and for the lumbar degenerative disc disease, noted "symptoms stable" (doc. 191-3, p. 90).  In August 2022, the doctor suggested that Stevens increase his physical activities and noted that Stevens "walked in, got up/down off exam table w/ease in no apparent distress" and reported no pain (doc. 107-1, p. 12-13).  Stevens is currently working in textile production with UNICOR.  There is no mention of any limitation on the use of Stevens' hands or prescription for a hand or wrist brace.  At present, only a knee and back brace have been prescribed.

    12) Hyperparathyroidism, hypercalcemia, Vitamin D deficiency, and adenoma

Stevens includes hyperparathyroidism among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). Stevens reports that he was diagnosed with hyperparathyroidism in 2012, hypercalcemia in 2014, and a Vitamin D deficiency in 2022, which are related to an adenoma[28] in his left parathyroid

---

[28] "A tumor that is not cancer. It starts in gland-like cells of the epithelial tissue (thin layer of tissue that covers organs, glands, and other structures within the body)." https://www.cancer.gov/publications/dictionaries/cancer-terms/def/adenoma "An untreated parathyroid adenoma could cause complications related to hypercalcemia. A rare clinical phenomenon is a parathyroid crisis, which is characterized by extremely high calcium levels, usually more than 15 mg/dL. Symptoms include changes in mental status leading to nervous system failure and coma." https://www.ncbi.nlm.nih.gov/books/NBK507870/

gland (doc. 191, p. 4-5, 13; doc. 199, 3-4, doc. 207, p. 2).  He argues that the adenoma is causing hyperparathyroidism (abnormal parathyroid levels) which in turn causes hypercalcemia (high calcium levels) and Vitamin D deficiency. Stevens asserts that malignancy is a common cause of elevated calcium levels, and therefore, the adenoma may be a malignancy (doc. 191, p. 4).  He also asserts that if this condition is not properly treated, he could develop osteoporosis (Id., p. 5). He points out that the prison doctors and other treating doctors have recommended surgery to remove the adenoma, but he has not received the surgery. Stevens also reports that the doctors recommended a bone density scan, but he has not received the scan. From this he argues that he may have cancer which could spread or has spread to other parts of his body, and he may have deterioration of his bones.

In December 2020, the prison clinician indicated that Stevens' calcium levels were elevated and that his parathyroid hormone level should be checked (doc. 191-2. P. 64). In March 2021, Stevens' lab results indicated an elevated parathyroid hormone level (doc. 191-3, p. 62). In August 2021, a CT scan was interpreted as "consistent with left parathyroid adenoma" (doc. 191-3, p. 46). In December 2021, Stevens was referred to a surgeon to evaluate his left parathyroid gland (doc. 191-3, p. 37-39).  The surgeon noted the CT scan results. He recommended another CT scan, thyroid hormone test, and calcium levels test "ASAP" (doc.191-3, p. 37-39).

Also, in December 2021, the prison doctor noted as follows:

> 12-21-21 lab reports notable for frankly elevated PTH coupled with hypercalcemia is consistent with primary hyperparathyroidism (known diagnosis). It does not appear that inmate Stevens is currently taking any medication that would cause hypercalcemia. However, he has had a rectal malignancy previously which could cause this lab finding; in addition he has upcoming consults to assess left axilla to rule out malignancy. Unfortunately, malignancy are among the most common causes of elevated calcium.

(Doc. 191-3, p. 25).  The prison doctor requested a chest CT scan with contrast marked "urgent" (Id., p. 34).  In February 2022, the surgeon recommended that Stevens be "scheduled for a left parathyroidectomy" (doc. 199-3, p. 31). In August 2022, the prison doctor requested an endocrinology consult:

> Inmate Stevens is a 66yo AA male with confirmed asymptomatic, persistent hypercalcemia (rpt x2: 11.3, 11.5) with normal crea, normal albumin, but

elevated PTH (repeat x 2; 138, 118; PTH-rp negative) c/w primary
hyperparathyroidism (PHPT; bone scan pending). Consult for recommendation
of either non-surgical vs. surgical management given inmate age to preclude
long-term renal and skeletal sequalae of condition above.

(Doc. 207-1, p. 12).  The prison doctor also requested a bone scan, noting "Inmate
Stevens is a 66yo AA male with primary hyperparathyroidism (PHPT) for which this
procedure is indicated to assess bone density (i.e., osteopenia vs. osteoporosis) in lieu of
condition above."  (doc. 207-1, p. 13).

At present, Stevens takes a Vitamin D supplement – cholecalciferol (doc. 207-1,
p. 12). Lab tests indicate that Stevens' parathyroid hormone levels are high (doc. 191-3,
p. 15, 28, 62; doc. 207-1, p. 10, 20) and his calcium levels are high (doc. 207-1, p. 7, 10,
20-21).  But he is otherwise asymptomatic (Id., p. 12).  However, the Court is without test
results for bone density or kidney function.  His treating prison doctor has requested an
endocrinology "consult for recommendation of either non-surgical vs. surgical
management given inmate age to preclude long-term renal and skeletal sequalae of
condition above." (doc. 207-1, p. 12).

13) <u>Meniscus Derangements, Infected Bursitis and Left Knee Pain</u>

Stevens reports that he was diagnosed with meniscus derangement in 2016 and
infected bursitis in 2019 (doc. 191, p. 12).  In 2019, he reported left knee pain without
tenderness or decreased range of motion.  The treatment plan was to renew Tylenol (doc.
191-3, p. 90, doc. 199-3, p. 8, 28).  In 2022, he reported "significant leg and knee pain,
swelling and numbness" in his left leg (doc. 199, p. 3; doc. 199-3, p. 8, 28).  Stevens
attributes his knee pain to his rheumatoid arthritis (doc. 191, p. 5).

The medical records indicate that Stevens has osteoarthritis, chondromalacia
patella, an enthesophyte (bone spur), and prepatellar bursitis in his left knee (doc. 199-3,
p. 8, 28).  X-rays taken on April 8, 2022, were interpreted as follows:

IMPRESSION:

1. Normal alignment of the left knee without acute bony abnormalities or joint
effusion.

2. In the interval, mild-moderate joint space narrowing is now seen in the medial
joint space compartment. Minimal patellofemoral compartment osteoarthritis

appears similar. Patchy subcortical lucency involving the articular surface of the patella is visualized now which could be secondary to chondromalacia patella.

3. Redemonstration of 9 mm quadriceps tendon enthesophyte.

4. Mild prepatellar soft tissue swelling, decreased from the previous study. Correlate for prepatellar bursitis.

(Doc. 199-3, p. 28). On April 21, 2022, the nurse noted Stevens' report of pain in his knee and swelling and intermittent numbness in his lower leg. The nurse recommended that Stevens "elevate left leg at night to decrease edema", take ibuprofen or Tylenol as needed for pain, apply ice, and to purchase a knee brace (doc. 199-3, p. 8). The nurse found that Stevens had "+1 edema to the left lower leg" without inflammation and "no difficulty ambulating." (Id.).

Stevens argues that this condition of his left knee is an indication that his rheumatoid arthritis is not effectively managed (doc. 191, p. 5; doc. 199, p. 3). His reviewing rheumatologist referenced knee pain among the reasons Stevens should be seen by a rheumatologist (doc. 191-4). The rheumatologist's opinion was based on information in the medical records before March 2022, which appears to be the May 2021 x-ray. This x-ray was compared to the April 2022 x-ray to make the diagnosis (doc. 199-3, p. 28).

No medical care provider has recommended a knee replacement, injections, physical therapy, or any treatment beyond medication, elevation, and a knee brace. As stated, the radiologist interpreted the conditions in Stevens' knee as "mild-moderate", "minimal" or "mild" with "normal alignment" and no "acute bony abnormalities or joint effusion." (doc. 199-3, p. 28).

14) <u>Colon polyps and history of rectal cancer</u>

Stevens includes rectal cancer among the "myriad of health problems" which show his health is deteriorating because of aging (doc. 191, p. 3). Stevens reports that he was diagnosed with colon polyps in 2018 and includes this diagnosis in his list of "current" medical conditions (doc. 191, p. 12). His medical records indicate a colonoscopy in April 2018 and removal of an adenocarcinoma in June 2018 (doc. 191-3, p. 38, 51) ("stage 1 colon cancer", p. 91). His August 2019 colonoscopy showed "no

neoplasia at region of anastomosis". A polyp was removed, and a follow up colonoscopy was recommended (Id., p. 91, p. 110; "colonoscopy in 3 years", p. 113; "negative for dysplasia and malignancy", p. 114). In February 2022, Stevens had a colonoscopy "with orders to repeat colonoscopy in 5 years" (doc. 207-1, p. 17).

     15) <u>Umbilical hernia and excision of foreign body</u>

Although not on the list of diagnosed conditions (doc. 191, p. 11-12), Stevens includes his hernia surgery among the "multitude of serious medical conditions, several of which are not currently diagnosed or effectively treated" (Id., p. 12-14). Stevens argues that he had hernia surgery in 2018 and since then, the wound was infected and ultimately the hernia mesh became visible (doc. 191, p. 14).

In 2018, Stevens had a surgical repair of an umbilical hernia (doc. 191, p. 14; doc. 191-3, p. 35; 199-3, p. 56). In May 2021, Stevens complained of mesh extruding from the surgery site and drainage for about two years (doc. 191-3, p. 56-57). The clinic examiner confirmed his complaint noting "suspect this is mesh from history of umbilical hernia repair … Pinpoint open wound to the area x 2 years with serious drainage. Will order consult for follow-up with general surgeon for further evaluation and treatment" (Id.). On December 15, 2021, Stevens "went out to see the doctor concerning the hernia repair surgery that he had performed approximately two years ago that has not completely healed." (Id., p. 36). On February 2, 2022, in an outpatient procedure, the surgeon removed a "foreign body" from Stevens' "abdominal wall fascia" (doc. 199-3, p. 31). Stevens had follow-up care in prison. There are no reports of complications (doc. 199-3, doc. 207-1). His umbilical hernia appears to be resolved.

     16) <u>Pre-diabetes</u>

Although not on the list of diagnosed conditions (doc. 191, p. 11-12), Stevens includes pre-diabetes among the "myriad of health problems" which show his health is deteriorating because of aging (Id., p. 3). He argues that he is pre-diabetic (doc. 191, p. 3, 6, 15; doc. 205, p. 3).[29] His prison medical records do not include a diagnosis of pre-

---

[29] Diabetes is referenced in the ophthalmologist's report where he assessed "Diabetes mellitus type 1" (doc. 191-3, p. 54). This appears to be a mistake. There is no indication that Stevens has been diagnosed with Type 1 diabetes. This type of diabetes typically manifests in childhood or adolescence but may manifest in adults and typically requires treatment with insulin, as well as

diabetes. He relies upon his rheumatologist's opinion after review of the medical records (doc. 191-4) ("According to his recent lab tests, Mr. Stevens is pre-diabetic. He could develop diabetes if not prevented through diet, medication, and/or exercise.").

Additionally, when Dr. Desai gave his opinion in March 2022, the most recent lab report was dated December 2021. Stevens' blood glucose level was high at 134, with 74-106 as the normal range (doc. 191-3, p. 27).  However, a series of blood glucose tests results were recorded while Stevens was hospitalized in April 2022 for removal of the lipoma.  Applying the normal range of 74-106 as in the lab report upon which Dr. Desai relied: On April 29, 2022, normal at 97; April 30, 2022, normal at 97; May 1, 2022, high at 116; May 2, 2022, high at 120; May 3, 2022, normal at 106 (doc. 199-3, p. 22, 21, 19, 17, 16).  In July 2022, his blood glucose was high at 142 (doc. 207-1, p. 21).  Thus, for three of the last six tests, Stevens' blood glucose level was normal.  Arguably, Stevens may not be pre-diabetic.

17) Immediate concerns of cancer

Stevens includes potential malignancies among the "multitude of serious medical conditions, several of which are not currently diagnosed or effectively treated" (doc. 191, p. 12-14). Stevens argues that the lipoma, which has now been removed, "may not be a benign lipoma but instead may be a very dangerous malignant tumor – a liposarcoma" (doc. 191, p. 4).[30] He asserts there are no medical records indicating whether the lipoma was biopsied upon removal.  He also argues that the adenoma in his parathyroid gland could be a malignant cancer, and that a biopsy and surgery to remove this tumor are necessary (Id., p. 13).  He also argues that his rectal cancer may return, and he should be monitored for this condition (Id., p .13, 15).

In United States v. Monaco, the Eleventh Circuit recognized Monaco's argument that "the body and mind deteriorate over time." 832 Fed. Appx. at 629–30.  The Eleventh Circuit

---

diet and lifestyle changes.  https://www.mayoclinic.org/diseases-conditions/type-1-diabetes/symptoms-causes/syc-20353011

agreed that "indeed they do" (Id.). However, the Eleventh Circuit explained that "until [Monaco] has actually experienced a 'serious deterioration' because of the aging process, the policy statements do not support age alone as an extraordinary and compelling reason for compassionate release." (Id.).  Stevens argues that his "myriad" of health conditions indicate that he is experiencing a serious deterioration.  As Stevens point out, his conditions have been diagnosed "as he aged through his 50s and 60s" (doc 191, p. 11).  However, the aging process is typically accompanied by age-related and non-age-related medical conditions.  The issue is whether the deterioration is "beyond what is normal to many individuals as part of the aging process." United States v. Ramirez, 2022 WL 17411279, at *1.  Many of Stevens' conditions do not meet this standard.  Some no longer exist. Specifically, Hepatits C, lipoma, colon cancer, status post-hernia repair surgery, and hyperlipidemia. Some present only with minimal symptoms and are controlled with medications or medical equipment.  Specifically, lumbar disc disease (back brace), dental issues (dentures), benign prostate hyperplasia, and hypertension.  His Sickle Cell trait is asymptomatic and pre-diabetes has not been diagnosed.

However, at present, three medical conditions indicate that Stevens is experiencing a serious deterioration because of the aging process, which is beyond what is normally experienced.  Although the loss of his left eye has not been linked to the aging process, that loss in combination with the deterioration of his right eye shows a serious deterioration in his vision beyond what is normal as part of the aging process. Although there is no evidence that Stevens has active or current iridocyclitis or uveitis, he presently experiences chronic dry eye syndrome (Sicca Syndrome or Sjogren's Syndrome) which appears related to his rheumatoid arthritis, and

---

[30] His concerns about cancer in the lymph nodes have been alleviated "for the time being" by a CT scan (doc. 191, p. 12).  There are no medical records indicating treatment for lymphoma.

he has glaucoma, a "moderate central" corneal opacity,[31] and a cataract in his right eye.  He has been prescribed darkened lenses to protect the remaining vision in his right eye.  Stevens' current diagnosis of rheumatoid arthritis and consequent or related joint issues, neuropathies, and dry eye syndrome, although stable with medication, support his argument. Last, Stevens' current diagnosis of hyperparathyroidism and parathyroid adenoma support his argument.  Although hyperparathyroidism and parathyroid adenoma do not appear to be age-related medical conditions, the medical records indicate that Stevens' age is a critical factor in treatment decisions.  His treating prison doctor has requested an endocrinology "consult for recommendation of either non-surgical vs. surgical management given inmate age to preclude long-term renal and skeletal sequalae" of the hyperparathyroidism (doc. 207-1, p. 12). Accordingly, the Court finds that Stevens has shown an extraordinary and compelling reason for a reduction of sentence.

### B. Covid 19, age, and compromised immune system

Stevens also argues that although he has been vaccinated,[32]  the immunosuppressive medication for his rheumatoid arthritis (Humira or adalimumab), his age, hypertension, Hepatitis C, and incarceration in a "high-spread, congregate setting" work together to diminish the effectiveness of his vaccine and render him vulnerable to future variants (doc. 191, p. 16-17). Stevens points out that he "is not arguing that his vulnerability to future variants of COVID-19

---

[31] "Corneal opacities are eye problems that can lead to scarring or clouding of the cornea, which decreases vision. The cornea is the clear, dome-shaped area that covers the front of the eye. Light passes through the cornea before reaching the retina in the back of the eye, and so it must remain clear so light can pass through. Corneal opacities can cause anything from minor irritation to vision problems and even blindness." https://www.webmd.com/eye-health/corneal-opacities

[32] The medical records indicate that Stevens received the Moderna vaccine in January 2021, February 2021, and December 2021 (doc. 199-3, p. 250).

qualifies on its own as an 'extraordinary and compelling reason' justifying release under" the

"Medical Condition of the Defendant" category (doc. 204, p. 4) (citing U.S.S.G. § 1B1.13, cmt.,

n.1(A)).  Instead, he argues that his vulnerability to Covid 19 "is one of the many aspects of his

health which—when considered in combination with his many other current medical problems—

leads to the conclusion that [he] has suffered a 'serious deterioration' of his physical health"

because of the aging process (Id.); U.S.S.G. § 1B.1.13., cmt., n.1(B).

According to the Centers for Disease Control and Prevention, people over age 65 and

those with certain illnesses have an increased risk of severe illness if they contract Covid 19.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

conditions.html (last updated February 10, 2023) (Last visited May 3, 2023) ("Older adults are at

highest risk of getting very sick from Covid-19. More than 81% of Covid-19 deaths occur in

people over age 65. . .  A person's risk of severe illness from Covid-19 increases as the number

of underlying medical conditions they have increases.").  Stevens has rheumatoid arthritis for

which he takes adalimumab, brand name Humira.  This medication carries the following warning

"Using adalimumab injection products may decrease your ability to fight infection and increase

the chance that you will develop a serious infection, including severe fungal, bacterial, and viral

infection that may spread through the body."

https://medlineplus.gov/druginfo/meds/a603010.html#top.  (Last visited May 3, 2023).

"Adalimumab injection products are in a class of medications called tumor necrosis factor (TNF)

inhibitors. They work by blocking the action of TNF, a substance in the body that causes

inflammation." https://medlineplus.gov/druginfo/meds/a603010.html#top.  (llLast visited May 3,

2023). The CDC explains that "[m]oderate and severe immunocompromising conditions and

treatments include but are not limited to:  Active treatment with . . . tumor necrosis factor (TNF)

blockers, . . ." (Last updated May 1, 2023) (Last visited May 3, 2023).

https://www.cdc.gov/vaccines/covid-19/clinical-considerations/interim-considerations-us.html.

The risk associated with Covid 19 is reduced by vaccination, even if the immune response "may

not be as strong" because of the person's medication or immunocompromised status.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/immuno.html ("If you

are moderately or severely immunocompromised (have a weakened immune system), you are at

increased risk of severe COVID-19 illness and death. Additionally, your immune response to

COVID-19 vaccination may not be as strong as in people who are not immunocompromised.")

(Last updated April 19, 2023) (Last visited May 3, 2023).

At present one inmate has tested positive for Covid 19 at FCI Jesup.  No staff members

have tested positive. https://www.bop.gov/coronavirus/  (last visited May 3, 2023). Overall, FCI

Jesup has 1,597 total inmates: 977 at the FCI, 105 at the Camp, and 515 at Federal Satellite Low.

The facility is at Level 1 Operations, the lowest and least restrictive level, and applies when the

inmate medical isolation rate is < 2%.  The operation level is determined by the "facilities'

COVID-19 inmate isolation rate and the COVID-19 community risk of the county where the

facility is located." (Id.).

Although Stevens' age, incarceration, and immunocompromised condition may place him

at increased risk of severe illness or death if he contracts Covid 19, the three vaccinations

provide some degree of protection from Covid 19.  Any increase in risk due to the close living

conditions while incarcerated is mitigated by the low level of Covid 19 at FCI Jesup and the

precautions currently in place, as well as his vaccinated status.  Thus, his increased risk regarding

Covid 19 does not indicate that he is presently experiencing a serious deterioration because of

aging, which is "beyond what is normal to many individuals as part of the aging process." United

States v. Ramirez, 2022 WL 17411279, at *1.  However, should Covid 19 begin to spread through the facility, Stevens' age, and medical conditions, even with his vaccinated status, likely would increase his risk of severe illness or death if he contracts the virus.  Thus, this increased risk, accompanied with Stevens' medical conditions of vision loss, rheumatoid arthritis, and hyperparathyroidism, as addressed herein, may qualify as an extraordinary and compelling reason for a reduction of sentence.

C. Danger to the safety of any other person, or the community

The Court must also consider whether Stevens is a danger to the safety of any other person, or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).  To do so, the Court considers the weight of the evidence against Stevens, his history and characteristics including his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings" 18 U.S.C.§ 3142(g).[33]

Although Stevens did not shoot the victim and did not exit his vehicle, Stevens drove Knight to the store, and left the scene after the shooting.  However, he turned himself in to law enforcement the day after the incident.  According to his Presentence Investigation Report, Stevens was a career criminal as defined in U.S.S.G. § 4B1.1 (doc. 190, under seal). He had two prior felony convictions for controlled substance offenses.  Although his criminal history score

---

[33]  The Court may also consider "whether, at the time of the current offense or arrest," Stevens was on probation, parole, or other release. 18 U.S.C. § 3142(g)(3)(B).  Stevens' presentence investigation report indicates that his parole for the prior drug offenses ended in 1991.  Stevens committed the instant offense in 1993 (doc. 190, under seal).

was 7, which would correlate with a criminal history category of IV,[34] because of his career

offender status, his criminal history category was VI.  The then-mandatory Sentencing Guideline

for his conviction under 18 U.S.C. § 2119, stated that if a victim was killed under certain

circumstances, the applicable Guideline was U.S.S.G. § 2A1.1, addressing first degree murder,

and under that Guideline, the base offense level was 43.  With a criminal history category of VI

and a base offense level of 43, the Guideline for imprisonment was life.

At present, Stevens is classified at a "Low Risk Recidivism Level" and his "security

classification" is "medium" (doc. 191-2, p. 2).  Stevens points out that at his age, 67, he is

statistically less likely to re-offend (doc. 191, p. 22). In support, he cites a chart published by the

United States Sentencing Commission which shows that federal offenders who are 65 years or

older have the lowest rate of recidivism, 4.1% (Id.).

As to rehabilitation, in 1997, Stevens had one disciplinary sanction for being in an

unauthorized area (doc. 191-2, p. 1). While incarcerated, Stevens obtained his GED and

completed drug education classes and other educational and self-improvement classes (doc. 191-

2, p. 2, 14-15).  He has worked as an electrician, painter, and in maintenance (Id., p. 6-8).

Stevens has worked for UNICOR since 2019 "and currently works in the production of textiles"

(doc. 191, p. 8).  Stevens provides a letter from his prison counselor who reports as follows:

> Inmate Steven, Rayford presents himself as a model inmate at FCI Jesup. I have
> never had any issues with Inmate Stevens. He has been at FCI Jesup since January
> of 2009. He has adjusted to incarceration and follows the rules and regulations of
> the institution. He stays to himself and is always polite and cordial. He has been
> programming and is currently working in Unicor. It is my professional
> observation that inmate Stevens has prepared and is continuing to prepare himself
> to re-enter society. He has developed skills to become a productive citizen.

---

[34] Even with a criminal history category of IV and with a base offense level of 43, his Guideline
range remained at life.  U.S.S.G. Sentencing Table.  Ch. 5, Pt. A.

(Doc. 191-8, p.1).

He also provides a letter from his Unit Manager, who reports as follows:

I have known inmate Rayford Stevens (of the Federal Correctional Institution - Jesup, Georgia) since his arrival here in 2009. He has been working in the UNICOR factory and Maintenance (painter). He has been receiving outstanding work evaluations from his detail supervisor. He has accelerated in levels of increasing responsibility.

While at FCI Jesup, he has maintained clear conduct and he is actively participating in the Educational department. He has earned his GED since incarceration (2011). Rayford Stevens has equipped himself to be a productive citizen. We are proud of his accomplishments and rehabilitation.

(Doc. 191-8, p.1).

The Court has considered the relevant factors in 18 U.S.C. § 3142(g), Stevens' age and his low risk of recidivism, medium level security classification, absence of significant disciplinary history while incarcerated, consistent work history, and the recommendations of his counselor and unit manager at UNICOR. The Court has also considered that the two prior offenses which resulted in his status as a career offender under the Sentencing Guidelines, were non-violent drug offenses.[35]  The Court has also considered Stevens' release plan which includes living with his elderly mother with the support of his sisters who live nearby.  Also, Stevens will be supervised by the U.S. Probation Office for a period of five years.  For these reasons, the Court finds that Stevens' early release would not pose a danger to the community or the safety of any person.

---

[35] Stevens' criminal history indicates that he was arrested once at age 18 for removing property from a residence, a municipal offense, and was sentenced to a conditional discharge.  In 1976, when Stevens was 20, he was arrested by city police for possession of a knife, but the Probation Office was unable to locate information regarding the disposition of this offense. He was convicted at age 31 and 32 for felony drug offenses for which he served approximately three years in state prison. At age 35, he was convicted of driving under the influence, a municipal offense.

D. <u>The relevant factors in 18 U.S.C. § 3553(a)</u>

The Court must also consider the relevant factors in 18 U.S.C. § 3553(a).  In that regard,

the Court of Appeals for the Eleventh Circuit offers the following guidance:

> The sentencing factors listed in 18 U.S.C. § 3553(a) that a district court must consider when imposing a sentence include the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from the defendant's further crimes, and provide the defendant with appropriate medical care or other correctional treatment. 18 U.S.C. § 3553(a)(2). They also include the "nature and circumstances" of the offense, the "history and characteristics" of the defendant, the types of sentences available, the types of sentences established by the applicable guideline range, any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities between similarly situated defendants, and the need to provide restitution to victims. <u>Id.</u> § 3553(a)(1), (3)-(7).
>
> We have determined, in cases where consideration of the § 3553(a) factors is mandatory, that the weight that each § 3553(a) factor receives is a matter within the sound discretion of the district court. <u>United States v. Williams</u>, 526 F.3d 1312, 1322 (11th Cir. 2008) (addressing a defendant's challenge to his sentence on direct appeal). In such cases, the district court is not required to explicitly recite the language of § 3553(a) or address each factor individually so long as the record reflects that the district court considered the factors. <u>United States v. Ghertler</u>, 605 F.3d 1256, 1262 (11th Cir. 2010).

<u>United States v. Morales</u>, 859 Fed. Appx. 478, 480–81 (11th Cir. 2021).

For the following reasons, the Court finds that Stevens' early release would not be

contrary to the relevant factors in § 3553(a). The Court has considered the nature and

circumstances of the offense. Without dispute, the car-jacking crime was serious. The victim

died and his fiancé was severely traumatized (doc. 190). However, Stevens did not use a firearm

and did not exit the vehicle.  Although he drove away, he voluntarily turned himself in to law

enforcement the next day.

The Court has also considered Stevens' history and characteristics.  The presentence

investigation report indicates that Stevens' criminal history was not extensive and none of his

prior convictions were for crimes of violence.  His inmate records indicate that he committed

only one minor infraction. In this circumstance, the Court finds that serving 29 years in prison is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from the defendant's further crimes.

Although Stevens' then-mandatory Sentencing Guidelines range was life, the statute of conviction did not provide a mandatory minimum.  Specifically,

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119 (effective October 15, 1992, to September 30, 1996). Thus, a reduction of sentence to time served, 29 years, falls within the statutory sentencing range.

IV. Conclusion

Upon consideration, and for the reasons set forth herein, Stevens' motion is due to be granted.

**DONE** and **ORDERED** this 3rd day of May 2023.

s / Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**